## In re FELDSTEIN.

(District Court S. D. New York. May 11, 1901.)

BANKRUPTCY—DISCHARGE—IMPROPER BOOKS.

A bankrupt was engaged in business, and kept books, and employed a bookkeeper. For more than two years prior to his bankruptcy he was largely and increasingly insolvent, his liabilities exceeding his assets at the time of his bankruptcy by half a million dollars. During such two years he lost in gambling and stock speculations over $200,000, which was taken out of his business, but during all such time his books showed him to be solvent. This arose largely from the fact that he took notes from customers who were indebted to him on account as shown by the books, and, instead of crediting them to the makers, sold or discounted such notes, and credited the proceeds to himself as money put into the business by him, and against such credits he drew the money to pay his gambling losses, which did not appear on the books. He kept two small memorandum books in his desk, in which the note transactions were entered, but they were not a part of his regular system of books. *Held*, that such books were calculated to conceal his true financial condition, and, since he must have known of his insolvency, it was a reasonable inference that they were fraudulently so kept with that intent, and in

contemplation of bankruptcy, so as to bar his right to a discharge, notwithstanding his denial of such knowledge or intent.

In Bankruptcy. On application for discharge, and objections thereto.

The following is the report of Ernest Hall, referee, to whom the application and objections were referred:

The specifications filed by the objecting creditors are as follows: First, they charge that the bankrupt, with fraudulent intent concealed his true financial condition and in contemplation of bankruptcy, failed to keep books of account or records from which his true condition might be ascertained; and the facts in regard to this specification are fully set out in the subdivisions following the specifications. The second specification is, that the bankrupt did knowingly and fraudulently omit from his schedule of assets his interest and ownership in the house occupied by him, known as "No. 34 West 71st Street," in the city of New York, represented by certain amounts paid out by checks of the bankrupt in reducing liens and incumbrances on the property, and which amounts are set forth in full in the specifications. The third specification charges that the bankrupt did knowingly and fraudulently make a false oath and account in and in relation to his proceedings in bankruptcy, and the fourth specification charges, that the bankrupt concealed, while a bankrupt, from his trustee in bankruptcy, certain property belonging to his estate, consisting of a sum of money, being a portion of the moneys drawn by him from his deposit in the Pacific Bank, and not included in or accounted for by the checks drawn for gambling and stock speculations.

The only specifications which were seriously pressed before me were those relating to the failure to keep proper books of account, and the concealment of assets by the bankrupt from his trustee, consisting of his interest in or ownership of the house No. 34 West 71st street, New York City.

In regard to the latter specification, I find from the evidence before me that said specification is not sustained; that said house was owned by the wife of the bankrupt, was purchased with her separate and individual funds not derived from or through the bankrupt, and that all payments for, or on account of the purchase of said house, or for taxes or principal or interest of incumbrances thereon which were paid by the bankrupt were paid out of funds in his hands belonging to his wife, and not obtained by her from or through him.

The other specification as to the failure to keep proper books of account and the failure to enter therein the various matters mentioned in the subdivision of the first specification, present a much more serious and difficult question.

Before going into a discussion of the testimony regarding this alleged failure to keep proper books, it may be well to record a general statement of the condition of the bankrupt during the last two years before his bankruptcy. I find from the evidence that the bankrupt was insolvent to the amount of $75,000 and more on January 1, 1898, and more than $175,000 on December 31, 1898, and more than $360,000 on December 31, 1899, and more than $500,000 on May 1, 1900, without regard to debts owing to his wife and her family, amounting to more than $90,000.

Between September 19, 1898, and April 12, 1900, and during all or a part of which time the bankrupt was hopelessly insolvent, he lost in gambling at roulette, etc., the enormous sum of more than $160,000 in gambling houses in New York, and paid the same out of moneys drawn from his business, in addition to about the sum of $75,000 lost in speculations in stocks.

Under the provisions of the present bankruptcy act, these losses furnish no ground for refusing a discharge nor have the same been noted here for any such purpose; the law must be administered as it stands, and it is not for the courts to criticise its provisions, and I want to be understood as giving no weight or consideration whatsoever to those matters in forming my conclusions, but refer to those facts only in connection with the very peculiar method of bookkeeping adopted by the bankrupt, and of possibly aiding in the elucidation of the reasons for adopting such methods.

I have carefully examined the cases cited in the very clever brief submitted by counsel for the bankrupt, who has certainly been at great pains to present every fact and every argument which could be presented on that side of the case, and I agree fully with his statement of the law; that no special form of bookkeeping is required so long as the bankrupt keeps books or records of his business in such a way as that an ordinary person, having a general knowledge of accounts, could discover his true financial condition; nor is it of any particular consequence what kind of books or records are kept, so long as that end can be reached by reasonable examination. I also agree that in order to bar the discharge, the books must have been kept incorrectly with a fraudulent intent, and in contemplation of bankruptcy, but I am of opinion that no direct evidence of an avowed fraudulent intent is necessary, but that it is sufficient if such intent can reasonably be inferred from the circumstances surrounding the matter, and that if a man, who is hopelessly insolvent and must know it, keeps no books of account or keeps them in such a manner as to conceal his true financial condition, and a distinct purpose or reason is apparent for such action, the fraudulent intent may properly be inferred.

Counsel for the bankrupt lays great stress upon the fact that ever since the bankrupt commenced business in 1894 and when he was entirely solvent, he kept his books in the same manner as during his insolvency. While he was solvent, and could promptly meet all his obligations and before the passage of the bankrupt act, he was at liberty to keep his books in any manner he pleased or to keep no books at all, but when he asks the benefits of the bankrupt act he is bound to show a compliance with its provisions regarding his books as well as any other requirements, but if he kept improper or incorrect books before the passage of the bankrupt act and to such an extent as to make them improper or insufficient under the act, he should, upon the passage of the act, have altered his system of bookkeeping so as to comply with its requirements, if he ever expected to seek the benefit of its provisions.

I am convinced from the evidence that some time during the year 1898 and certainly at the end of that year, the bankrupt knew that he was insolvent, and could not meet his obligations and he turned to gambling and stock speculations in hopes of retrieving his losses, but he went from bad to worse and rapidly used up his assets and the money of his creditors. But counsel argues that his books, if improperly kept, were not so kept in contemplation of bankruptcy and the bankrupt testifies that he did not know he was insolvent and did not contemplate bankruptcy until April, 1900. If that were all that was necessary, it would never be possible to find that a man did anything in contemplation of bankruptcy; he could fail to keep any books or keep them in the most false and fraudulent manner possible and still say that he did not contemplate bankruptcy. The proper interpretation of the law does not in my opinion require that the bankrupt should go forth and make a declaration that he contemplated filing a petition in bankruptcy, but that from the condition of his affairs and the knowledge with which he must properly be charged regarding them, he could plainly see that there was nothing for him but bankruptcy; to hold anything else would be tantamount to a complete nullification of the act in this respect.

I have therefore no hesitation in finding from the evidence that the bankrupt knowing that he was insolvent and in contemplation of bankruptcy within the meaning of the law, and with intent to conceal the true condition of his business and affairs, kept his books in the manner he did, and it only remains to determine whether his books were kept in such a manner as to conceal his true condition.

In arriving at my conclusions in this matter I have not given great weight to the question of the relations existing between Zellweger & Co. and the bankrupt, or to the discussion of the question whether the agreement between them constituted a general or special co-partnership; I regard that question as largely academic so far as its bearing upon the result in this case is concerned.

It stands admitted by the record in this case before me, that the bankrupt was indebted to the firm of Zellweger & Co. in nearly $300,000, and, whether

the partnership between them was general or special, the transactions out of which that indebtedness arose consisted in forwarding goods by them to the bankrupt to be sold for their account and the proceeds accounted for and returned to them in Switzerland, and they as much as any other creditors were entitled to have their accounts correctly kept by the bankrupt; and even were this not true, the other creditors were certainly entitled to have those accounts correctly kept, because it was only by correct entries in that account as well as all others that the true condition of the bankrupt could be ascertained.

The bankrupt had a set of books, kept by a bookkeeper during his entire business career, and under his direction and instructions. The facts regarding the method of keeping the books are not disputed. The accounts of all debtors were entered in the day book and ledger in the regular way so far as charges were concerned, and when the accounts were partially or wholly paid by notes, as seems to have been the course of business, the bankrupt either had them discounted with his indorsement or else sold them absolutely, and without recourse; but in the former case no credit was given to the customer for the notes, although the proceeds thereof had been received by the bankrupt, but the debit balance was shown as if no note had been given, and no entry of the notes were made in the ledger. The result of this would be that any one examining the books for the purpose of ascertaining the true financial condition of the bankrupt would have found all the debit balances in favor of the bankrupt, just the same as if no notes had been given, and this sometimes amounted to hundreds of thousands of dollars, when in fact those accounts were not owing at all, but had been closed by notes, which should have appeared in the several accounts, and should also have appeared in a bills receivable account which was not kept in the ledger. But this was not the only misleading result of such a course of bookkeeping. When a note was discounted and the proceeds received by the bankrupt, such proceeds were credited to his account as so much cash paid in by him, and the books showed very large amounts so credited, which without explanation would make it appear that he had put into the business very large sums of money, and would thus enable him to make the enormous withdrawals of money used by him in his gambling and stock transactions without comment.

It is true that the bankrupt kept in his desk two small memorandum books in which he entered these note transactions and the various discounts, but I do not consider them a part of the regular books of account kept in his business for the information of those interested, but merely private memoranda made for his own information and purposes.

In regard to the enormous amounts of money withdrawn to pay gambling debts, it is true that most of the checks given for that purpose were entered either in his firm check book or his individual check book, some of them being regularly entered on the stubs of the checks and some of them only on the opposite pages and not on the stubs, but the purpose of the payment was never stated nor was any account kept in the books showing the purposes. But the bankrupt claims that they were made to such well-known gamblers as to give notice of their purpose to any one examining the books. I hardly think the court can take judicial cognizance of such a state of facts, and I beg to remark that the names of all such persons to whom the checks were made were entirely unknown to me, and probably would have been unknown to any interested person examining the books, although it might have been discovered on a thorough overhauling of the books that they were not business creditors. I think that the books were clearly false in not showing the reasons for these immense payments, and that they were purposely so kept in order to conceal the reason of these withdrawals, and in connection with the credit of the proceeds of discounted notes to the bankrupt, were intended to lead any one to believe that the bankrupt had paid in large sums as capital, and paid the same out as he lawfully might, if the facts regarding such credits were true. I am also of opinion that the failure to enter the notes received in payment of the goods consigned by Zellweger & Co. and to whom the bankrupt was indebted nearly $300,000 was a fraudulent concealment of the facts, and an examination of the books by Zellweger & Co. by

ordinary methods would have shown that the purchasers of their goods were still indebted to Feldstein for the entire amount.

The same remarks will apply to the failure to enter in the regular books the stock transactions and the losses resulting therefrom, and also the failure to enter in such books the amount of indebtedness to the Siercks and Mrs. Feldstein, amounting to over $90,000.

It is true that the bankrupt says that he kept in his private desk one or more little memorandum books in which entries of these matters were made, but the trustee who took possession of all the assets and books has failed to discover any such books, nor does the bankrupt produce them; but, assuming that there were such books, they were no part of the regular system of bookkeeping and the bookkeeper had no access to them, so that any ordinary creditor examining the books of account would necessarily have passed over this large amount of indebtedness.

So far from considering these memorandum books as well as those in which the note transactions were entered as a part of the regular books of account, I consider that they were kept in the manner described for the express purpose of concealing the true condition of the bankrupt from his creditors and compelling them to resort to the regular books, which would show at all times, down nearly to the bankruptcy, a solvent condition.

In regard to the very large amounts paid for gambling debts in April, 1900, and one upon the very day on which the bankrupt consulted his lawyers regarding the making of an assignment, I find that three of them were not entered at all even in the check book; and while I should not regard that omission standing alone as fatal to the bankrupt's discharge, I am not at all impressed by the attempted explanation of the bankrupt of the failure to make such entries. I think that for the last two years the bankrupt simply plunged headlong into all manner of gambling without thought for his creditors, and did his best to conceal the real facts from them, and only ceased when there was nothing left to gamble with.

The argument of the learned counsel for the bankrupt that the expert Klaw, who was employed by the trustee to examine the books, was enabled to make an accurate statement of the bankrupt's condition is not at all conclusive to show that the books were properly kept. Neither he nor any other expert could have made a correct statement from the books regularly kept in the business, but being an expert of many years' standing and having possession of the memorandum books containing the entries of the note transactions, and by examining the checks drawn for gambling, and finding no corresponding entries in the books, he was enabled by questioning and investigation to make a substantially true statement, as he says, "when he had the key."

So might one solve any enigma if he had the key, but the ordinary creditor examining the books would not have had the key and could not have even approximated the true financial condition of the bankrupt.

Much more might be said upon the subject, and much more has been said by the counsel for the creditors, but it seems to me that it has been clearly demonstrated that the bankrupt, with fraudulent intent to conceal his true financial condition and in contemplation of bankruptcy, has failed to keep books of account or records from which his true financial condition could be ascertained, and that the first specification is sustained by the evidence and the discharge should be refused.

The second specification is not sustained by evidence and should be dismissed.

The third and fourth specifications were not pressed by counsel for creditors, and were withdrawn.

Putney, Twombly & Putney, for bankrupt.

Blumenstiel & Hirsch, Black, Olcott, Gruber & Bonynge, Lord, Day & Lord, Stern & Rushmore, and Julius Goldman, for creditors.

BROWN, District Judge. Upon examination of the evidence and books in this case, I am entirely satisfied that the discharge of the

bankrupt should be denied on the grounds stated by the referee in his admirable opinion. I will only add that no system of bookkeeping, as it seems to me, could be devised that would be more calculated to mislead and deceive persons referred to the books for information as to the capital of the bankrupt invested in his business, which under this system of bookkeeping appeared at all times to be much larger than it was in fact.